# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| LISA GERESE HERSEY,<br>    *Plaintiff,*<br><br>      v.<br><br>NANCY A. BERRYHILL,<br>*Acting Commissioner of Social Security,*<br>    *Defendant.* | No. 3:18-cv-2047 (VAB) |

## RULING AND ORDERS ON THE DECISION OF THE COMMISSIONER

Lisa Gerese Hersey ("Plaintiff") filed this administrative appeal under 42 U.S.C. § 405(g) against Andrew Saul,[1] the Commissioner of Social Security ("Defendant" or "the Commissioner"), seeking to reverse the decision of the Social Security Administration ("SSA"), denying her claim for Title II disability insurance benefits and Title XVI supplemental security income under the Social Security Act. Compl., ECF No. 1 (Dec. 13, 2018).

Ms. Hersey moves for a judgment on the pleadings reversing the decision of the Commissioner. Mot. to Remand or Reverse, ECF No. 12 (May 7, 2019) ("Pl.'s Mot."), ECF No. 31; Mem. in Support of Pl.'s Mot., ECF No. 12-1 (May 7, 2019) ("Pl.'s Mem."); Statement of Material Facts, ECF No. 12-2 (May 7, 2019) ("Pl.'s SMF").

The Commissioner moves for an order affirming his decision. Mot. and Mem. for an Order Affirming the Decision of the Commissioner, ECF No. 16 (Aug. 7, 2019) (Gov't Mem."); Statement of Material Facts, ECF No. 16-1 (Aug. 7, 2019) ("Def.'s SMF").

---

[1] When a party in an official capacity resigns or otherwise ceases to hold office while the action is pending, the officer's successor is automatically substituted as a party, regardless of the party's failure to so move or to amend the caption; the Court may also order such substitution at any time. Fed. R. Civ. P. 25(d); *see also Williams v. Annucci*, 895 F.3d 180, 187 (2d Cir. 2018); *Tanvir v. Tanzin*, 894 F.3d 449, 459 n.7 (2d Cir. 2018). The Clerk of Court therefore will be ordered to change the defendant of the case from Ms. Berryhill to Mr. Saul.

For the reasons explained below, Ms. Hersey's motion is **GRANTED**. The decision of the Acting Commissioner is **VACATED** and **REMANDED** for rehearing and further proceedings in accordance with this Ruling and Order. The Acting Commissioner's motion is **DENIED**.

## I.       FACTUAL AND PROCEDURAL BACKGROUND

### A.              Factual Allegations

Born in 1967, Ms. Hersey has no past relevant work. Pl.'s Statement of Material Facts, ECF No. 12-2 ¶¶ 1-2 (May. 7, 2019) ("PSMF"); Transcript of Administrative Proceedings, ECF No. 7 at 688 (Feb. 8, 2019) ("Tr."). She has a limited education, and whether she received special education in school is disputed. PSMF ¶ 3, Tr. 688. *See also* Def.'s Responsive Statement of Material Facts, ECF No. 16-1 ¶ 3 (Aug. 7, 2019) ("DSMF") (citing reports where Ms. Hersey denied having a history of special education, Tr. 317, 1013; and Ms. Hersey's testimony on July 19, 2018, that she was in special education at school, Tr. 792).

The Administrative Law Judge ("ALJ") found Ms. Hersey to have the following severe impairments: "chronic obstructive pulmonary disease (COPD), Depressive Disorder, Learning Disorder, and [a] history of Alcohol/opioid Dependence in remission." PSMF ¶ 4; Tr. 677.

### 1. Medical History

On February 18, 2004, Ms. Hersey reported a history of bilateral knee surgery, following a motor vehicle accident, and a history of migraines to Julia Banks, Advanced Practice Registered Nurse ("APRN") at Generations Family Health Center ("Generations"). Tr. 395. APRN Banks evaluated her, and diagnosed hypertension, and migraines. Tr. 396. Evaluations on March 15, 2004, and April 11, 2004, resulted in similar diagnoses. Tr. 389, 392.

On July 28, 2004, Generations staff recorded Ms. Hersey's blood pressure as 128/80. Tr. 386. Generations staff examined her again on September 17, 2004 and assessed her as having poorly controlled infection and poorly controlled hypertension. Tr. 385. On March 7, 2005, she reported occasional migraines and insomnia. Tr. 379. On May 17, 2005, she reported insomnia, increased frequency of urination, nervousness, and anxiety. Tr. 377. On September 20, 2005, Generations staff, having assessed Ms. Hersey with tachycardia, advised her to have an EKG. Tr. 374. On February 8, 2006, after a report of headache with numbness, Generations staff again assessed her with poorly controlled hypertension and noted previous emergency room treatment for the same. Tr. 371.

On April 19, 2006, Generations staff examined Ms. Hersey and determined that she had a broken nose and black eye, caused from an assault from her husband. Tr. 369. She had gone to the emergency room after the assault. *Id.* Generations staff noted that she presented as very anxious and teary, and assessed her with hypertension, migraines, and domestic violence. *Id.*

On June 14, 2006, Generations staff examined Ms. Hersey for headache, hypertension, anxiety, and depression. Tr. 367.

On March 23, 2007, Dr. Colleen Casey examined Ms. Hersey. Tr. 50–51. She noted Ms. Hersey looked mildly anxious and slightly sad. An examination of her lungs showed a slightly increased expiratory chase. Tr. 50. Dr. Casey thought that her hypertension was sub-optimally controlled her asthma related to tobacco dependence, her alcohol use related to stress and depression, and she had a history of migraine headaches. *Id.*

On July 2, 2007, Dr. Casey again evaluated Ms. Hersey who reported continuing problems with anxiety and depression. Tr. 49. Dr. Casey reported Ms. Hersey's hypertension was a result of poorly controlled anxiety, depression, a history of domestic violence, and tobacco

dependence. *Id.* She also provided Ms. Hersey with telephone numbers for mental health assistance. *Id.*

On August 26, 2010, Dr. March Hillbrand performed a consultative exam following a request from Disability Determination Services.[2] Tr. 194–97. Dr. Hillbrand determined that: Ms. Hersey's affect was severely blunted, she appeared restless and depressed; her full scale IQ was 67, which is on the upper end of the mild mental retardation range; major depressive disorder, mathematics disorder, personality disorder, and borderline intellectual function; and she potentially had PTSD. *Id.* The diagnostic impressions also stated Ms. Hersey would benefit from having a representative payee assigned to her, because she was in early recovery from a substance abuse disorder. Tr. 1497. While Ms. Hersey had "lifelong cognitive limitations," Dr. Hillbrand indicated that they were not severe and had not interfered with work. Tr. 1497.

At the examination, Ms. Hersey reported being "physically capable of managing her hygiene tasks autonomously" without neglect, attending to household chores, managing her finances, and having a "small supportive social network." Tr. 1495. Dr. Hillbrand, however, found it difficult to assess the severity of her psychopathology because he believed Ms. Hersey to have been "less than totally candid about psychiatric symptoms. . . ." Tr. 1497.

On October 20, 2011, Dr. Urooj Ather evaluated Ms. Hersey, finding her to have elevated blood pressure and appearing to be anxious. Tr. 444. On December 19, 2011, Dr. Kerrian Hudson evaluated Ms. Hersey and found her somewhat disheveled and tired and her heart to be tachycardic. Tr. 442. Ms. Hersey complained of chronic back pain and chest discomfort. *Id.*

Ms. Hersey was admitted to physical therapy at Middlesex Hospital on January 4, 2012. Tr. 485. An exam there revealed decreased lumbar range of motion, hypomobility and pain with

---

[2] *See Cyr v. Astrue*, No. 3:10-cv-1032 (CFD) (TPS), 2011 WL 3652493, at *3 (D. Conn. Aug. 19, 2011) (defining "DDS" as Disability Determination Services.).

accessory motion testing, decreased strength in lower abdominals, and a positive prone instability test was appreciated. *Id.* The assessment determined Ms. Hersey was unable to sit for prolonged periods of time to perform activities of daily living. Tr. 485–86.

On January 9, 2012, Dr. Hudson evaluated Ms. Hersey and determined she had chronic obstructive pulmonary disease ("COPD") and hypertension. Tr. 440–41.

On February 9, 2012, Dr. Hudson again evaluated Ms. Hersey, and her assessment included hypertension,[3] chronic back pain, and depression. Tr. 438–39. Ms. Hersey reported then only being able to stand fifteen to twenty minutes before needing to sit down. *Id.* The same day, Dr. Hudson and Adam Seidner completed a physical medical source statement for Plaintiff. Tr. 477–82.

They determined Ms. Hersey: (1) can lift or carry up to ten pounds continuously secondary to degenerative joint disease and arthritis which causes chronic back pain (as seen on an MRI taken September 2010), Tr. 477; (2) sit twenty minutes, stand ten to fifteen minutes, walk ten to fifteen minutes at one time without interruption, sit for six hours, stand one hour and walk one hour in an eight hour day, Tr. 478; (3) can never kneel and only occasionally crouch secondary to pain, Tr. 480; (4) never use unprotected heights, be near moving mechanical parts, operate a motor vehicle, work in extreme hot or hold, occasionally she can work in humidity and wetness, and vibrations, and she can never tolerate loud noises, Tr. 481; and (5) cannot perform activities like shipping, travel without a companion, needs help in the shower, and gets easily confused, Tr. 482.

---

[3] *Kumar v. Berryhill*, No. 3:16-cv-01196 (VLB), 2017 WL 4273093, at *2 (D. Conn. Sept. 26, 2017) (indicating that HTN is an abbreviation for hypertension).

On February 28, 2012, Dr. Kattman examined Ms. Hersey and determined that she had chronic pain syndrome with decreased lumbar extension and impaired lumbosacral mechanics, and significant glue weakness, which contributed to her pain from prolonged standing. Tr. 498.

On February 29, 2012, Ms. Hersey received an MRI. The MRI revealed that her lumbar spine was performed. Tr. 483. Imaging of Ms. Hersey's bilateral knees also was taken. Dr. Bird gave an assessment of chronic post-operative and hypertrophic changes to the right knee. Tr. 484.

On March 13, 2012, Ms. Hersey reported knee pain. Tr. 436–47. An x-ray of her knee indicated a preliminary assessment of osteoarthritis. Ms. Hersey then was referred to Dr. Geist, the orthopedist who performed the previous knee surgeries. Tr. 436. Dr. Hudson made an assessment that Ms. Hersey's chronic obstructive pulmonary disease required Ventolin three times a week. Tr. 437.

On March 20, 2012, Dr. Kattman evaluated Ms. Hersey and noted significant left hip weakness and decreased stability in the left SLS. Tr. 499.

On July 9, 2012, Dr. Hudson evaluated Ms. Hersey and found she had hypertension, depression, insomnia due to mental disorder, chronic obstructive pulmonary disease, tobacco use disorder, and chronic back pain. Tr. 434–35.

On July 14, 2012, a CT scan of Ms. Hersey's abdomen and pelvis was performed. Dr. Walden's impression was chronic pancreatitis. Tr. 530.

On July 15, 2012, Ms. Hersey was admitted to Middlesex Hospital for alcoholic gastritis. Tr. 407. She was discharged the following day with a secondary diagnosis of alcohol dependence, hypertension, acute kidney injury, and anemia. *Id.*

On September 7, 2012, Ms. Hersey was again admitted to Middlesex Hospital. She claimed to have tripped over a metal slider and landed on her right side. On the exam, Ms. Hersey was afebrile, borderline tachycardic to 100, in moderate distress and crying secondary to pain. Tr. 514. An x-ray of her ribs revealed a fracture of the 8th and 9th ribs. Tr. 531.

On November 19, 2012, Dr. Hudson evaluated Ms. Hersey, who reported panic attacks and feeling very stressed at least once a week, described her attack as heart pounding, was irritable and restless, and had some chest pain. Dr. Hudson assessed her with depression, chronic back pain, and migraines. Tr. 426. Dr. Hudson also advised Plaintiff that, in light of numerous hospitalizations, she needed to stop all consumption of alcohol. Tr. 427.

On November 30, 2012, Ms. Hersey complained of migraines three times a week and sensitivity to sound. Dr. Hudson assessed her with chronic back pain. Tr. 423. Ms. Hersey also reported that her anxiety and mood had improved with the use of prescribed Paxil. *Id.*

On February 18, 2012, Ms. Hersey reported weight gain, fatigue, difficulty with handgrip, and an increased need for her inhaler. Dr. Hudson's assessment was depression, problem with literacy, hypertension, chronic back pain, chronic obstructive pulmonary disease and abnormal weight gain. Tr. 418-19. Dr. Hudson assessed her literacy problem after she observed that Ms. Hersey had "difficulty understanding [medication] instructions, which ha[d] impacted [Ms. Hersey's] medical compliance[.]" Tr. 419. Dr. Hudson "now writes down instructions at every visit and tries not to overwhelm Ms. Hersey with too much information." *Id.*

On May 3, 2013, Dr. Hudson evaluated Ms. Hersey and found she appeared thin and groggy. She also noted Ms. Hersey's skin positive for erythematous fluctuant mass under the left axilla, a normal heart, and expiratory wheezing. Her assessment was hypertension and depression. Tr. 416. Ms. Hersey also reported doing yardwork. *Id.*

On May 20, 2013, Dr. Ellen Galat evaluated Ms. Hersey's behavioral health. In her opinion, Ms. Hersey's profile was significant for depressed mood, sleep disturbances, limited energy and motivation, difficulty concentrating, anger, irritability, experiencing feelings of helplessness and hopelessness, anhedonia, and weight gain. On the mental status exam, Ms. Hersey appeared older than the stated age, guarded and an inconsistent reporter, and visibly frustrated and agitated at times. Her mood was anxious and affect congruent. Her diagnosis was recurrent moderate panic disorder with agoraphobia, alcohol dependence in early partial remission, cocaine dependence in early partial remission, rule out PTSD, rule out MDD, severe with psychotic features.. Tr. 577–78.

On July 2, 2013, Ms. Hersey spoke with S. Rutkauskas at the local Social Security Administration by telephone. Rutkauskas found Ms. Hersey had "problems remembering dates of marriage, divorce and other life events." Tr. 311. The interviewer otherwise found no deficiencies in her understanding, reading coherency, concentrating, talking, or answering questions. *Id.*

On June 25, 2013, Dr. Galat evaluated Ms. Hersey, who reported anxiety and auditory hallucinations. He assessed her with depression. Tr. 585. Dr. Galat also "strongly discourage[d]" Ms. Hersey from abusing substances. *Id.*

On September 11, 2013, Dr. Galat again evaluated Ms. Hersey. She reported physical pain, a tendency to stay home, and that it was difficult for her to go out. Her mood was moderately depressed and dysphoric. Tr. 588. The only mental status deficits Ms. Hersey showed were slow speech, a guarded manner, and fair insight and judgment. *Id.*

On October 28, 2013, at the request of DDS, Dr. Patrick Russolillo performed a one-time psychological evaluation. Ms. Hersey initially denied a history of alcohol or drug abuse, but after

being confronted with past statements, Ms. Hersey stated that "she thought that was the past" and that she could not remember the last time she had a drink. Tr. 459. The findings indicated Ms. Hersey had significant cognitive limitations and pervasive processing deficits. Tr. 460. She had limited understanding of her condition, and her judgment was assessed to be within normal limits. There was no evidence of sub-optimal performance or symptoms of exaggeration. *Id.* She was found to have limited cognitive ability and problem-solving skills, which compounded to affect her stress levels. The evidence suggested that Ms. Hersey's limitations were long-standing and that she had always had information processing deficits. The doctor suspected she always had memory issues, which now were exacerbated by her anxiety and low mood. Tr. 461.

From November 13, 2013, through November 6, 2014, Ms. Hersey received mental health treatment from Dr. Galat, Amanda McJunkins, Joan Dreyfus, and Scott MacGregor. Tr. 575–666.

On April 18, 2014, Ms. Hersey was admitted to Middlesex Hospital after experiencing a sudden onset of left arm and leg numbness, left leg weakness, and gait abnormality. The admitting diagnosis was Transient Ischemic Attack ("TIA").[4] Tr. 515–519. She admitted she had been drinking before with her husband. Tr. 520. On April 19, 2014, Ms. Hersey was readmitted and held until April 20, 2014. She received an ECHO Doppler on April 19, 2014, which resulted in the treating physicians concluding that she had a non-dilated left ventricle with normal systolic function, mild concentric left ventricular hypertrophy, intrinsically normal valves, and no pericardial effusion. Tr. 533–34.

On April 25, 2014, Ms. Hersey was examined at Middlesex Hospital–East Hampton Family Medicine for hypertension, chronic obstructive pulmonary disease, urinary tract

---

[4] *See Scipio v. Comm'r of Soc. Sec.*, 611 F. App'x 99, 101 (3d Cir. 2015) (noting that "TIA" stands for transient ischemic attack).

infection, alcohol withdrawal, and alcohol abuse. Tr. 571–73. Ms. Hersey reported going to a women's support group for alcohol, but she was still drinking three to four drinks, two nights a week. Tr. 571. She indicated she wished to cut down further. *Id.* She also reported her depression improved with the use of prescribed Cymbalta. *Id.*

On December 18, 2014, a medical source statement was completed by APRN Dreyfus and Dr. Manage Nissanka, Ms. Hersey's treating physicians at Middlesex Hospital Behavioral Health ("MBH"). Tr. 667–69. They made the following determinations in their treating opinions: they began treating Ms. Hersey on May 20, 2013, Tr. 667; she has marked limitations in her ability to understand, remember, and carry out instructions, *id.*; she has marked limitations in her ability to respond appropriately to others, Tr. 668; she has severe anxiety and depression with agoraphobia, making it difficult to leave her home and interact in society, *id.*; and she has an extreme restriction on activities of daily living, extreme difficulty in maintaining social functioning, frequent deficiencies in concentration, persistence or pace, and continual episodes of deterioration or decompensation in work or work like settings, *id.*

From July 7, 2015, through July 16, 2018, Dr. Tariq Latif treated Ms. Hersey's mental impairments and opioid abuse through psychotherapy. Tr. 1498–1658. In Dr. Latif's initial examination, he noted Ms. Hersey was appropriately groomed, made good eye contact, and had a pleasant demeanor. Tr. 1501. Her mood was euthymic and her thoughts logical and organized. *Id.* She denied auditory hallucinations or other psychosis, and was fully orientated, with good memory and attention, and fair insight and judgment. *Id.* He indicated she had stable psychiatric symptom management. Tr. 1502. Ms. Hersey regularly attended suboxone management and group therapy sessions with Dr. Latif. Tr. 1503–1658. Ms. Hersey's presentation at visits was

largely the same from her intake presentation, with the exception of her occasionally becoming upset during sessions while discussing her husband's death. Tr. 1503–1658.

From January 6, 2016, through July 16, 2018, Ms. McJunkins, LCSW, supplied supportive psychotherapy to Ms. Hersey. Tr. 113–18. On April 13, 2016, Ms. Hersey reported she was still drinking two to three drinks a day, but denied being as depressed or anxious as she had been in the past. Tr. 1116. Ms. Hersey did not return again until August 12, 2016, where she reported that she moved in her mother and mentioned cleaning and gardening. Tr. 1117. She denied drinking and presented as "mildly depressed," but "engaged in the sessions," without hallucinations, delusions, or suicidal ideation, and fair insight and judgment. *Id.* Ms. McJunkins discharged her from care on January 6, 2017 for nonattendance, after several attempts to schedule a follow-up after August 12, 2016. Tr. 1110. Her primary diagnosis was alcohol abuse. Tr. 1111.

On September 7, 2016, Dr. Shelley Burchsted treated Ms. Hersey at Middlesex Hospital for a fall three days before. She assessed a suspect occult right rib fracture, small right sided pleural effusion, and bronchospasm. Tr. 1148–51. Dr. Burchsted evaluated her again on September 15, 2016. At that time, Ms. Hersey reported rib pain and Dr. Burchsted diagnosed her with rib fracture and constipation. Tr. 1162–64.

On February 24, 2017, Dr. Kehl diagnosed Ms. Hersey with insomnia, hypertension, asthma, opioid abuse and GERD[5]. Tr. 1169–71. Dr. Kehl noted Ms. Hersey was "pre-contemplative for quitting her nightly alcohol," which Dr. Kehl thought might be contributing to her sleeping difficulties. Tr. 1160.

---

[5] *See Ortiz v. Astrue*, 875 F. Supp. 2d 251, 254 (S.D.N.Y. 2012) (indicating "GERD" stands for gastroesophageal reflux disease).

On April 10, 2017, Dr. Latif completed a mental medical source statement. He made the following determinations: Ms. Hersey has a limited ability to understand, remember, and carry out instructions; to respond appropriately to others; maintain the activities of daily living and social functioning; and she has frequent deficiencies of concentration, and repeated episodes of decompensation. Tr. 1478–80.

From May 22, 2017, to May 28, 2017, Middlesex Hospital treated Ms. Hersey for tonic-clonic seizure, likely secondary to alcohol. Tr. 1131–43. At intake, Ms. Hersey admitted to drinking heavily on a regular basis, but drinking less than usual the date she had a seizure. Tr. 1452. She also reported living alone and struggling with depression, following her husband's death. Tr. 1461. On May 27, 2017, Dr. Defigueiredo evaluated Ms. Hersey. He determined that she had major depressive disorder and alcohol withdrawal and seizure. He recommended keeping her in the hospital for further treatment. Tr. 1119. The diagnoses at discharge were "[c]omplicated [alcohol] [w]ithdrawal," as well as hypertension and major depression. Tr. 1464.

On June 15, 2017, Dr. Kehls evaluated Ms. Hersey, assessing she had alcohol abuse and hypertension. Tr. 1156–57. Ms. Hersey explained that, following discharge from Middlesex Hospital on June 2, 2017, she was referred to a partial hospitalization program. Ms. Hersey stopped attending because she did not have transportation. Tr. 1156.

On August 7, 2017, Dr. Latif prepared a mental medical impairment questionnaire. He diagnosed major depression, anxiety, and opioid use disorder. Ms. Hersey has no ability to handle frustration, limited ability to interact with others, and limited ability in task performance. Tr. 1178–85. He also assessed Ms. Hersey sometimes had a problem or reduced ability in using judgment, coping skills, asking questions, responding to those in authority, getting along with others, focusing on simple tasks, and performing basic activities at a reasonable pace. Tr. 1181–

82. He also believed she had an average function in caring for personal hygiene and physical needs. Tr. 1180.

From May 10, 2018, through July 27, 2018, Janice Keeman, LCSW treated Ms. Hersey. Tr. 1659–63. On July 11, 2018, Ms. Keeman summarized her treatment of Ms. Hersey in a letter to Attorney Grabow: Therapy started to treat Ms. Hersey's significant depression symptoms. Ms. Keeman noticed an impact in Ms. Hersey's cognitive processing and her short-term memory. Tr. 1481, 1489–83). Ms. Keeman had treated Ms. Hersey four times. Tr. 1481.

On July 15, 2018, Ms. Keeman completed a mental medical source statement. She determined that Ms. Hersey has extreme limitations in her ability to understand, remember, and apply information; marked limitations in her ability to interact with others; and marked limitations in her ability to maintain concentration, persistence and/or pace; and extreme limitations in her ability to adapt. Tr. 1483–87.

## 1. Disability Applications

Ms. Hersey first filed concurrent applications for a period of disability and disability insurance benefits under Title II of the SSA, Tr. 217–74, and for supplemental security income ("SSI") under Title XVI of the SSA, Tr. 275–84. She alleged her disability began December 31, 2002. Tr. 271, 275.

On March 25, 2015, an Administrative Law Judge ("ALJ") denied these applications after a hearing. Tr. 27–44.

On September 1, 2016, the Appeals Council of the Social Security Administration denied Ms. Hersey's request for review of the ALJ's decision. Tr. 829.

On December 22, 2016, Ms. Hersey filed a subsequent SSI application, alleging disability beginning April 23, 2010. Tr. 987.

On April 27, 2017, Ms. Hersey challenged the Commissioner's unfavorable ALJ decision on her concurrent applications for a period of disability, DIB, and SSI. *Hersey v. Comm'r of Soc. Sec.*, No. 3:17-cv-00701 (JCH) (April 27, 2017); Tr. 877.

On August 8, 2017, the subsequent SSI application was denied at the initial level and at the reconsideration level on October 6, 2017. Tr. 899–900.

On August 13, 2017, Ms. Hersey filed an application for disabled widow's insurance benefits under Title II of the SSA. Tr. 883. She requested a hearing on the subsequent SSI application on October 13, 2017. Tr. 917

On October 20, 2017, the District Court remanded the current applications to the Commissioner for further proceedings. Tr. 877.

The Appeals Council consolidated the subsequent SSI and disabled widow's insurance benefits applications with the remanded concurrent applications and remanded the consolidated applications for another ALJ hearing. Tr. 878–83.

On July 19, 2018, Ms. Hersey, represented by counsel, appeared and testified at an ALJ hearing regarding her consolidated applications for a period of disability, disability insurance benefits, disabled widow's insurance benefits, and SSI. Tr. 771. On the advice of counsel, she amended her alleged onset date to the filing date of her original concurrent applications. The ALJ determined that date to be June 24, 2013. Tr. 773, 703.

At the date of the hearing, Ms. Hersey's last insured date was December 31, 2006, which expired before June 24, 2013, the amended alleged onset date. Tr. 706, 1003. On the advice of counsel, Ms. Hersey then withdrew her June 24, 2013 application for a period of disability and disability insurance benefits, electing to proceed on the applications for SSI and disabled widow's insurance benefits. Tr. 773.

## 2.   ALJ Decisions

On September 10, 2018, the ALJ issued two substantially identical decisions, one addressing the disabled widow's insurance benefits claims, tr. 670–99; the other addressing the period of disability, disability insurance benefits, and SSI claims, tr. 700–28. The ALJ dismissed the application for a period of disability and disability insurance benefits based on Ms. Hersey's withdrawal at the hearing. Tr. 703, 773. The ALJ made twelve findings of fact with respect to Ms. Hersey's disabled widow's insurance benefits claim and eleven findings of fact with respect to her period of disability, disability insurance benefits, and SSI claim. Tr. 670–90; 703–19.

Regarding the remaining applications, at Step One of the sequential evaluation, the ALJ found Ms. Hersey had not engaged in substantial gainful activity. Tr. 677, 706.

At Step Two, the ALJ found that Ms. Heresey had the following severe medically determinable impairments: chronic obstructive pulmonary disease (COPD), depressive disorder, learning disorder, and history of alcohol and opioid dependence in remission. Tr. 706, 677.

At Step Three, the ALJ found that Ms. Hersey did not have an impairment or combination of impairments that met or medically equaled the severity of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 677–78, 707–08.

The ALJ determined that Ms. Hersey had the residual functional capacity ("RFC") to perform light work with the following additional limitations: occasional climbing of ramps and stairs, but never climbing ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, crouching, and crawling; a need to avoid hazards such as open moving machinery and unprotected heights; tolerating no concentrated exposure to vibration and only occasional exposure to temperature extremes and extreme humidity; performing simple and repetitive tasks;

no working in environments with strict production quotas; and tolerating only occasional interaction with the public. Tr. 680, 709.

At Step Four, the ALJ determined Ms. Hersey had no past relevant work. Tr. 688, 717.

At Step Five, the ALJ determined that, given Ms. Hersey's age, education, and vocational profile, she could perform work that exists in significant numbers in the national economy. Tr. 688-89, 717-18. The ALJ relied upon the testimony of impartial vocational expert Andrea Burnette that someone with Ms. Hersey's RFC could perform the following occupations including: inspector/hand packager, a garment sorter, and assembler/small products. Tr. 689, 718; 804.

With respect to the application for WIB, tr. 689–90, and the applications for SSI, tr. 719, the ALJ found Ms. Hersey not disabled June 24, 2013, through the date of the decision.

### B. Procedural History

On December 13, 2018, Ms. Hersey filed a complaint against then acting commissioner Nancy A. Berryhill. Compl., ECF No. 1 (Dec. 13, 2018).

On February 8, 2019, the Social Security Administration filed the Social Security Transcripts. Tr., ECF No. 7 (Feb. 8, 2019).

On May 7, 2019, Ms. Hersey moved to reverse the decision of the commissioner. Mot. to Reverse Decision, ECF No. 12 (May 7, 2019); *see also* Pl.'s Mem., ECF No. 12-1 (May 7, 2019); PSMF.

On August 7, 2019, the Government moved to affirm the decision of the Commissioner, which included a memorandum of law. Mot. to Affirm Decision, ECF No. 16 (Aug. 7, 2019); DSMF.

On September 4, 2019, Ms. Hersey filed a reply. Reply, ECF No. 19 (Sept. 4, 2019).

## II.      STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court reviewing a disability determination "must determine whether the Commissioner's conclusions 'are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard.'" *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (quoting *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997)); *see also Moreau v. Berryhill*, No. 3:17-cv-396 (JCH), 2018 WL 1316197, at *3 (D. Conn. Mar. 14, 2018) ("Under section 405(g) of title 42 of the United States Code, it not a function of the district court to review *de novo* the ALJ's decision as to whether the claimant was disabled . . . . Instead, the court may only set aside the ALJ's determination as to social security disability if the decision 'is based upon legal error or is not supported by substantial evidence.'") (internal citation omitted) (quoting *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998)).

"Substantial evidence is 'more than a mere scintilla.'" *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). "'It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Moran*, 569 F.3d at 112 (quoting *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008); *accord Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) ("Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'") (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). This is a "very deferential standard of review—even more so than the 'clearly erroneous' standard." *Brault*, 683 F.3d at 448 (quoting *Dickson v. Zurko*, 527 U.S. 150, 153 (1999)).

## III.  DISCUSSION

Ms. Hersey argues that the Commissioner's "findings are not supported by substantial evidence in the record," and that the "findings and conclusions constitute an abuse of [ ] discretion, and/or . . . an error of law." Mot. to Reverse Decision at 1. She "seeks an order remanding this matter" to an ALJ for rehearing[.] *Id.*

Ms. Hersey claims there are five issues with the ALJ's decision: (1) "[w]hether the ALJ erred at step 3 of the sequential process, in finding that there was no evidence of a 'low IQ' before the age of 22[;]" (2) "[w]hether substantial evidence support[s] the ALJ's finding at step 3 that the plaintiff only had mild to moderate restrictions in the 'paragraph B' criteria[;]" (3) "[w]hether the ALJ violated the 'treating physician rule', in that he failed to assign substantial weight to opinion of the plaintiff's treating sources, and/or failed to state good reasons for doing so[;]" (4) "[w]hether the ALJ substituted his opinion for the opinion of his treating sources[;]" and (5) "[w]hether the ALJ adequately developed the record, in that he assigned significant weight to an opinion rendered in December 2013, while simultaneously affording little weight to all subsequent opinions[.]"[6]

The Court addresses these issues in turn.

### A.  Step Three—Low IQ

"At step three of the sequential evaluation, the ALJ must determine if, based on the medical evidence, the claimant suffers from an impairment listed in Appendix 1, referred to as a 'Listing.'" *Newell v. Colvin*, 15 Civ. 7095 (PKC) (DF), 2017 WL 1200911, at *3 (S.D.N.Y. Mar. 31, 2017) (citing *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999)). "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An

---

[6] The ALJ issued two separate decisions, one for the WIB claims and one for the SSI claims. The decisions, however, were almost identical.

impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in the original) (citation omitted).

"For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment. *Id.* at 531 (emphasis in the original) (footnote and citation omitted). "To satisfy Listing 12.05, the claimant must make a threshold showing that she suffers from 'significantly subaverage general intellectual functioning with deficits in adaptive function.'" *Burnette v. Colvin*, 564 F. App'x 605, 607 (2d Cir. 2014) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05).

Ms. Hersey argues that she meets Listing 12.05 (Intellectual Disorder), both as it existed at the time of filing and as amended. Pl.'s Mem. at 8. In her view, the ALJ's discussion of listing 12.05 was limited and suggests that the ALJ failed to set forth sufficient evidence or rationale which would enable the Court to engage in meaningful review. *Id.* 9–10. She argues that the ALJ's finding of no evidence of a low IQ before age 22 "is not supported by, and in fact entirely contradicted by, the substantial evidence in the record." *Id.* at 10. In her opinion, the ALJ did not rebut the applicable presumption that "the cognitive deficit existed prior to age 22." *Id.* at 11. Thus, she concludes that the ALJ's "failure to discuss the IQ testing results and preferring reasons why the plaintiff did not have a low IQ, strongly suggests a misunderstanding of the law." *Id.* at 12.

The Commissioner argues first that the current version of Listing 12.05 applies and the ALJ applied the current version correctly. Gov't Mem. at 3–4. In his view, the Prior Listing 12.05 does not apply because the "Revision expressly state that '[w]hen the final rules [including the changes to Prior Listing 12.05] become effective, [the Commissioner] will apply them to new

applications filed on or after the effective date of the rules, and to claims that are pending on or after the effective date.'" *Id.* at 5 (emphasis omitted) (quoting *Revised Medical Criteria for Evaluating Mental* Disorders, 81 Revisions, 81 Fed. Reg. 66138, 66138 n.1 (Sept. 26, 2016) ("Revisions")). The Commissioner also argues that "the ALJ reasonably did not find sufficient evidence that Plaintiff's impairment arose prior to age 22[.]" *Id.* at 6. Ms. Hersey's significant history of alcohol abuse as an adult proffers "an alternative explanation for the cognitive deficits . . . . [and rebuts] the presumption that Plaintiff's cognitive limitations existed prior to age 22 . . . ." *Id.* at 7. In the Commissioner's view, this finding is further supported by a head injury stemming from a car accident in 1981. *Id.*

Ms. Hersey replies that the Government conceded that Ms. Hersey has a qualifying score and "that the presumption under *Talvera* is overcome is devoid [sic] of any support within the record, or the decision of the ALJ." Reply at 2. She further argues the record reflects she has marked restrictions, *id.* at 3, and that the medical opinions reflect "that the plaintiff has a listing level condition or is otherwise disabled due to her inability to maintain and sustain any type of competitive work activity," *id.* at 4. It is also Ms. Hersey's opinion that "the decision of the ALJ contains no substantive discussion of the trauma to which she has been exposed . . . ." and fails to discuss or explore her PTSD diagnosis. *Id.* at 4-5.

The Court agrees.[7]

One of the required criteria under Listing 12.05 is that the evidence of Intellectual Disorder was present before the age of twenty-two. As described in *Talvera*, a presumption

---

[7] The Court applies the current version of Listing 12.05. *See* Revisions, 81 Fed. Reg. at 66138 n.1 ("[T]hese final rules will be effective on January 17, 2017. . . . When the final rules become effective, we will apply them to new applications filed on or after the effective date of the rules, and to claims that are pending on or after the effective date.").

exists that a claimant's IQ will remain fairly constant throughout their lives. *Talavera v. Astrue*, 697 F.3d 145, 152 (2d Cir. 2012). The presumption properly limits coverage "'to an innate condition rather than a condition resulting from a disease or accident in adulthood.'" *Id.* (quoting *Navy v. Astrue*, 497 F.3d 708, 709 (7th Cir. 2007)).

The Government suggests that substantial evidence exists which provides alternative explanations for Ms. Hersey's cognitive deficits including her significant history of alcohol abuse as an adult and the head injury she suffered in 1981. In its view, while the ALJ may not have relied on these facts in making his determination, the evidence supports his ultimate conclusion. *See Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) ("An ALJ does not have to state on the record every reason justifying a decision."). With regard to her IQ, the ALJ noted that Ms. Hersey "was married, [and] had children[,]" tr. 679, 708, and refers to DDS report prepared by Dr. Hillbrand, Ex. 29F, tr. 1494–97, which characterized "her lifelong cognitive deficits as not severe and [ ] not interfer[ing] with past work[,]" tr 679, 708. The ALJ further noted that Dr. Hillbrand "concluded that [Ms. Hersey] was not fully candid about her mental health symptoms, which does not support listing level mental health issues." Tr. 679, 708.

But the Court cannot affirm "'administrative action on grounds different from those considered by the agency.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999)). "Thus, even if the Court could piece together from the record substantial evidence to support a finding that Ms. [Hersey] did not meet Listing [12.05], remand would still be required." *Perkins v. Berryhill*, No. 317-cv-200 (MPS), 2018 WL 3344227, at *3 (D. Conn. 2018).

While the ALJ found that Ms. Hersey "demonstrates mild to moderate limitations in some areas of functioning, but not marked or severe mental functional limitations," *id.*,[8] remand is appropriate as the ALJ did not base his findings of Ms. Hersey's low IQ on her history of substance abuse or 1981 car accident.

### B. Step Three—Paragraph B Criteria

"Section 12 lists various mental impairments, and it generally requires claimants to demonstrate that they meet 'the diagnostic description in the introductory paragraph and the criteria of both paragraphs A and B . . . of the listed impairment.'" *Douglass v. Astrue*, 496 F. App'x 154, 157 (2d Cir. 2012) (alteration in the original) (quoting 20 C.F.R. § 404 Subpart A, App'x 1, Pt. A, ¶ 12.00(A)). Intellectual capacity and adaptive functioning are independent concepts and must be evaluated separately. *Newell*, 2017 WL 1200911 at *5 (citing *Talavera*, 697 F.3d at 153).[9] Under various subsections of Listing 12.05, an individual may be entitled to an "irrebuttable presumption of disability," if "an individual has an impairment that is 'equal to' a listed impairment.'" *DeChirico v. Callahan*, 134 F.3d 1177, 1180 (2d Cir. 1998) (citing 20 C.F.R. § Pt. 404, Supt. P, App'x 1, Listing 12.05).

To satisfy "paragraph b" criteria, "the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or

---

[8] Specifically, Ms. Hersey has moderate restrictions in her ability to "understand, remember and apply information[,] . . . interact with others[,] . . . "[and] concentrate, persist and maintain pace." Tr. 768–69, 708. Ms. Hersey has mild restrictions in her ability to "adapt or manage [herself]." *Id.*

[9] "Adaptive function refers to an individual's ability to cope with the challenges of ordinary everyday life. Courts have held that if no one is able to satisfactorily navigate activities such as living on one's own, taking care of children without help sufficiently well that they have not been adjudged neglected, paying bills, and avoiding eviction, one does not suffer from deficits in adaptive function." *Talavera*, 697 F.3d at 153.

repeated episodes of decompensation, each of extended duration." *Lebron v. Berrihill*, 14 CV 5921(CS)(LMS), 2018 WL 4658808, at *13 (S.D.N.Y. June 11, 2018).

Listing 12.05(b) may be satisfied "by a showing of (1) a full scale IQ score of 70 or below; (2) an extreme limitation of one, or a marked limitation of two, in the ability to a) understand, remember, or apply information, b) interact with others, c) concentrate, persist, or maintain pace, and d) adapt or manage oneself; and (3) evidence that the disorder began before age 22." *Reid v. Berryhill*, No. 3:18-cv-153 (SRU), 2019 WL 4919532, at *14 n.13 (D. Conn. Oct. 3, 2019).

 "[P]ersonal characteristics consistent with adequate adaptive functioning[] include[] the ability to navigate public transportation without assistance, engage in productive social relationships, and manage[] [one's] personal finances[;] and the display of fluent speech, coherent and goal-directed thought processes, and appropriate affect." *Talavera v. Astrue*, 697 F.3d 145, 154 (2d Cir. 2012). "[T]here is no necessary connection between an applicant's IQ scores and her relative adaptive functioning." *Id.* at 153.

Ms. Hersey argues the ALJ's allegedly erroneous conclusion that Ms. Hersey "did not have a listing level qualifying IQ score" renders the rest of his assessment concerning the degree of impairment flawed. Pl.'s Mem. at 13. It is her position "that the reasons offered by the ALJ in assessing only mild to moderate restrictions in the so called 'B' criteria are without any support within the record[.]" *Id.*

The Government argues that Ms. Hersey's "premise of this argument is wrong because . . . the ALJ accepted the IQ score itself as valid even if he did not conclude that Plaintiff's impairment arose prior to age 22." Gov't Mem. at 10. Moreover, "the ALJ's rationale with respect to each relevant area was convincing and easily determinable based on the record." *Id.* In

the Government's view, the ALJ's findings in the area of "understanding, remembering, and applying information," "interaction with others," "concentrating, persisting, or maintain pace," and "adapting and managing oneself" were all reasonably concluded and supported by substantial evidence. *Id.* at 11–12. As a result, the Government argues "the ALJ properly found that Plaintiff did not have qualifying adaptive deficits for the purposes of Listing 12.05B2." *Id.* at 13.

In her reply, Ms. Hersey argues that the ALJ's "rationale in assigning less than marked restrictions is . . . flawed." Reply at 3. She emphasizes her abusive past relationship; that the ALJ found she bore children, not that she raised children; and that her ability to cooperate with medical professions essentially holds Ms. Hersey's compliance against her. *Id.* at 3. The evidence the ALJ demonstrates "that the ALJ cherry picked facts, which are tangential and lack persuasiveness, in order to reach a finding in regard to the listing level criteria." *Id.*

The Court agrees.

In determining that Ms. Hersey experienced no "marked or severe mental functional limitations[,]" the ALJ placed "great weight" and relied on the assessment of Dr. Khursid Khan, a medical consultant with DDS. Tr. 678, 707. The ALJ offers no explanation as to why he relied on the assessment of Dr. Khan over other assessments or medical source statements. The ALJ places great weight in finding Ms. Hersey has moderate restrictions in her "ability to understand, remember, and apply information[,]" and then points out that Ms. Hersey could perform daily activities. Ex. B17E—Activities of Daily Living, Tr. 1018–26.

In finding Ms. Hersey has moderate limitations in her ability to interact with others, the ALJ refers to her ability to cooperate with medical professionals and get along with family, friends, and neighbors. There is also record evidence supporting Ms. Hersey's moderate

limitation in her "ability to concentrate, persist and maintain pace." Tr. 678, 708. Ms. Hersey can "remember, understand and complete simple routing tasks[,]" and she was able to answer questions posed and to concentrate at the hearing. Tr. 679, 708.

But the ALJ does not specify which physicians' assessments he relied on or what weight he gave their findings in citing the record evidence. "The term 'cherry picking' generally refers to 'improperly crediting evidence that supports findings while ignoring conflicting evidence from the same source . . . The fundamental deficiency involved with 'cherry picking' is that it suggests a serious misreading of evidence, or failure to comply with the requirement that all evidence be taken into account, or both . . . .'" *Rodriguez v. Colvin*, No. 3:13CV1195(DFM), 2016 WL 3023972, at *2 (D. Conn. May 25, 2016) (quoting *Dowling v. Comm'r of Soc. Sec.*, No. 5:14-Cv-0786 (GTS) (ESH), 2015 WL 5512408, at *11 (N.D.N.Y. Sept. 15, 201)). The ALJ relied exclusively on Dr. Khan's assessment, a consultant who did not treat Ms. Hersey himself, and selected examples in her treatment history when she appeared cooperative to medical professionals.

Because the ALJ "did not provide sufficient explanations for why he afforded weight to certain parts of the opinions and not others[,]" remand is warranted. *White v. Berryhill*, No. 3:17-cv-01310 (JCH), 2018 WL 2926284, at *7 (D. Conn. June 11, 2018).

### C. Treating Physician Rule

The treating physician rule gives "deference to the views of the physician who has engaged in the primary treatment of the claimant." *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003). Under this rule, "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with

the other substantial evidence in [the] case record.'" *Burgess*, 537 F.3d at 128 (quoting 20 C.F.R. § 404.1527(d)(2)); *see also Greek*, 802 F.3d at 375. Failure to provide "'good reasons' for not crediting the opinion of a claimant's treating physician" can be a basis for remand. *Id.* at 129–30 (quoting *Snell*, 177 F.3d at 133).

As to the nature and severity of a claimant's impairments, "[t]he SSA recognizes a rule of deference to the medical views of a physician who is engaged in the primary treatment of a claimant." *Greek*, 802 F.3d at 275; *see also Burgess*, 537 F.3d at 128. The treating physician's opinion "is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence." *Rosa*, 168 F.3d at 78 (citations omitted).[10]

Where an ALJ does not assign "controlling weight" to a treating physician's opinion, they must "consider certain factors to determine how much weight to give it, and should articulate 'good reasons' for the weight given." *See Camille v. Colvin*, 652 F. App'x 25, 27 (2d Cir. 2016) (citing *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)); *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1998) (requiring an ALJ to "provide a claimant reasons when rejecting a treating source's opinion"); *Schrack v. Astrue*, 608 F. Supp. 2d 297, 301 (D. Conn. 2009) ("The regulations further provide that even if controlling weight is not given to the opinions of the treating physician, the ALJ may still assign some weight to those views, and must specifically explain the weight that is actually given to the opinion.").

The treating physician's opinion, however, is not afforded controlling weight where "the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." *Halloran*, 362 F.3d at 32.

---

[10] On March 27, 2017, new regulations took effect that effectively abolish the treating physician rule; for claims filed before March 27, 2017, however, the treating physician rule continues to apply. *See* 20 C.F.R. § 416.927; *Smith v. Comm'r of Soc. Sec. Admin.*, 731 F. App'x 28, 30 n.1 (2d Cir. 2018)).

"[T]o override the opinion of the treating physician," the ALJ must consider, under the relevant regulations, factors including "(1) the frequently [sic], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (citing *Burgess*, 537 F.3d at 129). "'An ALJ does not have to explicitly walk through these factors, so long as the Court can conclude that the ALJ applied the substance of the treating physician rule[.]" *London v. Comm'r of Soc. Sec.*, 339 F. Supp. 3d 96, 102 (W.D.N.Y. 2018) (quoting *Scitney v. Colvin*, 41 F. Supp. 3d 289, 301 (W.D.N.Y. 2014)). The ALJ "must 'comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion.'" *Burgess*, 537 F.3d at 129 (quoting *Halloran*, 362 F. 3d at 33 and citing 20 C.F.R. § 404.1527(d)(2)).

As part of the ALJ's affirmative duty to develop the administrative record, "an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." *Rosa*, 168 F.3d at 79. There are, however, cases where the treating physician should not be provided controlling weight. *See, e.g., Halloran*, 362 F.3d at 32 (holding that "the opinion of the treating physician is not afforded controlling weight where, as here, the treating physician issued opinions that are not consistent with other substantial evidence in support, such as the opinions of other medical experts").

Ms. Hersey argues that the "ALJ did not assign any of the treating sources significant weight." Pl.'s Mem. at 17. According to Ms. Hersey, the ALJ mischaracterizes Dr. Russolillo's overall assessment of her condition improving, "when the number of providers" increased and the frequency of care increased, *id.* at 17–19, and the ALJ afforded little weight to APRN Dreyfus, Dr. Nissanka's assessments, and Ms. Keeman's assessment, *id.* at 19-20. Contrary to

the ALJ's opinion, "[Ms. Hersey's] mental status exams are not generally benign" and the reliance on Ms. Hersey's listing level IQ score, which is inconsistent with the record and without medical support, "substantially undermines [the ALJ's] findings." *Id.* at 20.

The Government responds that the "ALJ properly considered and weighed the opinion evidence of record." Gov't Mem. at 13. In its view, the analysis "of each cited opinion complied with 20 C.F.R. §§ 404.1527 and 416.927, and substantial evidence supports the ALJ's assessment of weight." *Id.* at 14. In its view, the ALJ also "reasonably assigned little weight to Dr. Russolillo's opinion[,]" as he examined her once and Ms. Hersey began receiving treatment that same year "'which has resulted in document improvement of her condition.'" *Id.* at 15 (quoting Tr. 683, 712).

The Government also notes that the ALJ cited Ms. Hersey's "'generally benign' mental status examinations . . . and reasonably concluded the examinations were benign because they showed no serious deficits of cognition, memory, attention, or concentration," *id.* at 17, and the ALJ appropriately gave partial weight to the opinions of Ms. Dreyfus and Dr. Nissanka and noted that they "rendered their opinion on a checkbox form . . . declined to cite to supportive clinical findings or other rationale where prompted," *id.* at 18.

In its view, these facts support the ALJ's decision not to give controlling weight to their opinions. *Id.* at 19. As to Ms. Keeman, the Government argues substantial evidence supports the ALJ's assessment that Ms. Keeman's 2018 letter and 2018 opinion were entitled to little weight. *Id.* at 19–20.

In her reply, Ms. Hersey argues that every medical provider who treated her, including APRN Dreyfus, Dr. Nissanka, Dr. Latif, and Ms. Keeman, has "rendered an opinion that can only be consistent with a finding that the plaintiff has a listing level condition or is otherwise

disabled due to her inability to maintain and sustain any type of competitive work activity."
Reply at 4. In her view, the ALJ assigned insufficient weight to her treating physicians' opinions
and instead "relies extensively on an opinion rendered by a non-examining, non-treating source
in December of 2013[.]" *Id.* She is cognitively impaired and suffers from severe depression and
anxiety, caused by significant trauma. *Id.* In her view, the ALJ also failed to discuss her PTSD
diagnosis. *Id.* at 4–5.

The Court disagrees.

**1. Dr. Russolillo's Assessment**

The ALJ assigned Dr. Russolillo's opinion little weight. Tr. 683, 712. The ALJ noted that
Dr. Russolillo's assessment occurred in 2013. Tr. 683, 712. Even then, Ms. Hersey "was anxious
and appeared to become easily overwhelmed[,]" but "was able to persist throughout the
evaluation and demonstrated appropriate effort." Tr. 683, 712. Ms. Hersey began receiving
treatment, "which has resulted in document improvement of her condition." Tr. 683, 712. The
ALJ "remain[ed] persuaded that the claimant could perform simple and routine tasks within the
parameters discussed earlier in [his] assessment of her residual functional capacity." Tr. 683,
712. Given that Dr. Russolillo did not treat Ms. Hersey regularly and only examined her once,
the ALJ appropriately gave little weight to his opinion.

Ms. Hersey argues that Dr. Russolillo's assessment was mischaracterized and relied on
too much, but the record and the ALJ's opinion do not support this argument. Little weight was
afforded to Dr. Russolillo's testimony, and it seems that it was used as a baseline to compare her
status at 2013, before receiving treatment, to her current status, after receiving treatment. In
noting her condition has improved, the ALJ does not rely on Dr. Russolillo's opinion as much as

imply that the opinions of other medical professionals support the notion that her condition improved.

But as noted above, the ALJ failed to cite to which physicians or medical professionals' opinions he relied on in making that conclusion.

Accordingly, remand is warranted.

## 2. APRN Dreyfus and Dr. Nissanka's Assessments

The ALJ assigned partial weight to APRN Dreyfus's assessment and did not specifically discuss Dr. Nissanka's assessment. Tr. 683, 713. Instead, the ALJ refers to "[c]ontemporaneous medical evidence support[ing] significant symptoms" around the same time of APRN Dreyfus's assessment, Tr. 683, 713; and cites to one page of a behavioral health progress note prepared by Ms. McJunkins, ex. B14F—Behavior Health Progress Note, Tr. 664 (Ms. Hersey "continues to exhibit serious and disabling symptoms related to depression and anxiety with marked impairment in activities of daily living.). Ms. Hersey's treatment, starting in 2015, focused on her substance abuse, "but her psychiatric symptoms were mostly mild, and not consistent with the marked extreme limitations assessed by nurse Dreyfus" in her December 2014 report. Tr. 684, 713. The ALJ references notes taken by Dr. Latif on July 7, 2015. Ex. B20F, Tr. 1501. Dr. Latif noted mild anxiety and that she had no mild, meaning no imminent risk, tr. 1501, but the page prior his notes, under acute risk factors, states "suicide attempts moderate[.]" Tr. 1500.

In making this determination, the ALJ relied on other "contemporaneous medical evidence" but refers to two lines of notes from treatment providers who, at the time, had not been treating Ms. Hersey as long as APRN Dreyfus.[11]

---

[11] While previously it seems an APRN was not an acceptable medical source, *see Jone-Reid v. Astrue*, 934 F. Supp. 2d 381 (D. Conn. 2012) (noting than an APRN does not fall within the category of acceptable medical sources); *Kelly v. Berryhill*, No. 2:17-CV-1703 (VLB), 2019 1332176, at *10 (D. Conn. Mar. 25, 2019) (the treating physician rule did not apply to an APRN and so the APRN's opinion was not entitled to controlling weight) (citing to 20

Accordingly, remand is warranted. *See Jazina v. Berryhill*, 2017 WL 6453400, at *5 (D. Conn. Dec. 13, 2017) (affirming assignment of partial weight where "a fair reading of the ALJ's decision suggests that he declined to assign controlling weight because he found the treating physicians' opinion to be inconsistent with other evidence in the record").

Likewise, although Dr. Nissanka treated Ms. Hersey at Middlesex Hospital and executed a medical source statement for Ms. Hersey in December 2014, Tr. 667-69, the ALJ failed to discuss Dr. Nissanka's recommendations or the medical source statement.

Accordingly, for this reason as well, remand is warranted.

### 3. Ms. Keeman's Assessment

The ALJ assigned little weight to Ms. Keeman's assessment. Tr. 686, 716. Ms. Keeman only saw Ms. Hersey for four sessions during a two-month period and "did not provide a function by function assessment[.]" Tr. 686, 716. While Ms. Keeman may have noted Ms. Hersey spoke of hopelessness and helplessness, "had diminished eye contact, speech and depressed mood," and that her cognitive processing may have been impacted, Ms. Keeman only cared for her during May and June of 2018. Tr. 686, 716.

Under the treating physician rule, the ALJ is required to provide "'good' reasons for the weight given to a treating physicians opinion . . . . " *Halloran*, 362 F.3d at 33. In 2018, Ms.

---

C.F.R. § 404.1502), as of March 27, 2017, however, 20 C.F.R. § 404.1502(a)(7) includes licensed Advanced Practice Registered Nurses as acceptable medical sources.

For claims filed before March 27, 2017, like Ms. Hersey's, 20 C.F.R. § 404.1527 guides evaluating opinion evidence. Medical opinions are defined as "statements from acceptable medical sources that reflect judgments about the nature and severity of [] impairment(s), . . . . " and a treating source is defined as an "acceptable medical source who provides . . . medical treatment or evaluation and who has, or has had, an ongoing treatment relationship" with the patient. §404.1527(a)(1)-(2). Section 404.1527 does not specify further restrictions or limits on the definition of an acceptable medical source. "Depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an acceptable medical source or from a nonmedical source may outweigh the medical opinion of an acceptable medical source, including the medical opinion of a treating source." § 404.1527(f)(1). Whether or not APRN Dreyfus is considered an acceptable medical source, her treatment relationship with Ms. Hersey required closer examination of APRN Dreyfus's opinion.

Hersey's primary provider was Dr. Latif, who treated her over the course of two years for her mental impairments and opioid abuse. Tr. 1498–1658.[12] Given Ms. Keeman's treating history with Ms. Hersey, the ALJ provided good reason for the assignment of little weight.

Accordingly, there is no legal error and remand is not necessary on this issue.

### D. Substitution of Opinion

At each step, the ALJ, as a lay person, is not permitted to substitute his or her own judgment for competent medical opinion. *Rosa*, 168 F.3d at 79 (noting that the ALJ, as a lay person, was "not in a position to know whether the absence of muscle spasms would in fact preclude the disabling loss of motion described by [the doctor] in his assessment); *Thornton v. Colvin*, No. 3:13-CV-1558 (CSH), 2016 WL 525994, at *7 (D. Conn. Feb. 9, 2016) ("In the case at bar, the ALJ decided to disregard a treating physician's medical opinion that [the plaintiff] was disabled because, in the ALJ's lay view, the medical records did not support that medical opinion. This runs counter to the Second Circuit authority, which disapproves of a non-physician ALJ substituting his or her lay judgment, based upon a circumstantial critique, for competent medical opinion.").

Ms. Hersey argues that Dr. Decarli, an examiner for DDS, "render[ed] his opinion on December 20, 2013 . . . without access to the majority of the treatment records" from June 2013 through September 2018. Pl.'s Mem. at 21. She continues that, by adopting his opinion and affording insufficient weight to subsequent treating sources, "the ALJ has in fact become a de facto medical source of opinion." *Id.*

---

[12] "A physician who does not treat the plaintiff during the period between her alleged onset date and [date of last insured] does not qualify as a treating physician." *Torres v. Berryhill*, No. 3:18-cv-01485 (RAR), 2020 WL 38939, at *6 (D. Conn. Jan. 3, 2020) (citing *Monette v. Astrue*, 269 F. App'x 109, 112–13 (2d Cir. 2008)).

The Government argues that the ALJ's decision to give Dr. Decarli's opinion "partial weight overall and generally rely[ ] upon its findings" was appropriate. Gov't Mem. at 21. Dr. Decarli based his opinion on evidence available at the time of his opinion; it was well-reasoned and relied on record evidence; it was Dr. Decarli's specialty; and Dr. Decalri's assessments "were consistent with the ALJ's own findings of mild to moderate limitations at step three of the sequential evaluation." *Id.* at 22. Because "the evidence shows that Plaintiff's symptoms generally improved over time with treatment," it is reasonable that "nothing in the later treatment notes compelled the ALJ to conclude that Dr. Decarli's opinion was not consistent with the record as a whole." *Id.* at 23.

The Court disagrees.

The ALJ gave partial weight to Dr. Decarli's opinion because he agreed with his assessment that Ms. Hersey "does not have marked or severe mental functional limitations or psychiatric symptoms." Tr. 687, 716. While "Dr. Decarli's opinion [may be] well reasoned and largely rel[y] on the evidence of record[,]" Ms. Hersey received consistent treatment five years following his evaluation and maintained much longer relationships with some of the medical professionals treating her during that time. Tr. 687, 716.

The ALJ described why he relied on Dr. Decarli's opinion, noting that it relied on record evidence, and that he is a specialist.[13] The ALJ's rationale, however, fails to support a conclusion that this doctor's opinion should be entitled to more weight than other medical professionals who treated Ms. Hersey and examined her more frequently than Dr. Decarli did.

Accordingly, remand is warranted.

---

[13] For example, the ALJ writes, "Dr. Decarli's opinion regarding the claimant's remaining mental functional abilities largely supports my finding that while the claimant has mild to moderate mental functional limitations, she does not demonstrate such severe or marked symptoms or functional limitations as to preclude her from performing work with the parameters specified earlier in my discussion of her residual functional capacity." Tr. 687, 716.

### E. Development of the Record

An ALJ has an "affirmative duty to compile a complete record" when ruling on eligibility. *Brown*, 174 F.3d at 63; *see also Vargas v. Astrue*, No. 09 Civ. 6606 (BSJ) (DF), 2011 WL 9518014, at *9 (S.D.N.Y. Nov. 8, 2011) ("Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative duty to develop the administrative record."). The ALJ must "not only develop the proof but carefully weigh it." *Donato v. Sec'y of Dep't Health and Human Servs.*, 721 F.2d 414, 419 (2d Cir. 1983). The district court thus conducts "a plenary review of the administrative record to determine whether, considering the record as a whole, the Commissioner's decision is supported by substantial evidence." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002) (citing *Shaw v. Charter*, 221 F.3d 126, 131 (2d Cir. 2000)).

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Shaw*, 221 F.3d at 131 (quoting 42 U.S.C. § 405(g)). In cases "[w]here the Commissioner's decision rests on adequate findings supported by evidence having rational probative force," the district court will not substitute its "judgment for that of the commissioner." *Veino*, 312 F.3d at 586. And the district court may not "affirm an administrative action on grounds different from those conducted by the agency." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999).

Ms. Hersey argues the ALJ failed to develop the administrative record. Pl.'s Mem. at 22. In her view, the ALJ "should have either sought clarification from one or more of the treating sources, or retained the services of a medical expert, to opine on the entire relevant period." *Id.*

Because there was a contradiction in the treating sources, the appropriate course of action was to further develop the record. *Id.*

The Government responds that Ms. Hersey "cites no authority for the proposition that an ALJ must re-contact a treating source or call a medical expert when the ALJ is not 'persuaded' by a treating source's opinion[,]" a duty arises to contact a treating source only if the treating source opinion were unclear. Gov't Mem. at 23. The Government concludes that there are neither a condition which obligates nor a condition which permits an ALJ to obtain a medical opinion are present. *Id.* at 24.

The Court disagrees.

"The duty to develop the record sometimes demands that ALJs re-contact treating sources for clarification." *Edwards v. Berryhill*, No. 3:17-cv-298 (JCH), 2018 WL 658833, at *8 (D. Conn. Jan. 31, 2018). The Code of Federal Regulations permits ALJs to re-contact treating physicians to clarify the record, if after considering the evidence they cannot reach a conclusion about a claimant's disability. *Id.* at *9 (quoting 20 C.F.R. § 404.1520b(b)(2)). And "[e]ven if the ALJ had been justified in rejecting all of the medical opinion evidence in the record, he would have had a duty to develop the record by requesting additional medical opinion evidence." *Caciopoli v. Colvin*, No. 3:16-cv-949 (JAM), 2017 WL 3269075, at *6 (D. Conn. Aug. 1, 2017) (citation omitted).

As a result, to the extent that, upon remand, the record does not provide a sufficient basis for determining Ms. Hersey's intellectual capacity and adaptive functioning in relation to the IQ score identified for her as well as the "significant cognitive limitations and pervasive information processing deficits" already attributed to her in the record, Tr. at 460, the ALJ must further develop this record. *See Geckle v. Berryhill*, 2018 WL 1472518, at *4 (D. Conn. Mar. 26, 2018)

("The Second Circuit has held that the ALJ's duty to develop the record exists only when there are 'clear gaps' in the record." (citing *Rosa*, 168 F.3d at 79)).

IV.     **CONCLUSION**

For the reasons explained above, Ms. Hersey's motion is **GRANTED**. The decision of the Acting Commissioner is **VACATED** and **REMANDED** for rehearing and further proceedings in accordance with this Ruling and Order. The Acting Commissioner's motion is **DENIED**.

Consistent with this opinion, the Clerk of the Court shall change the defendant of the case from Ms. Berryhill to Mr. Saul.

The Clerk of the Court then is respectfully directed to enter judgment for Ms. Hersey, remand this case to the Acting Commissioner for rehearing and further proceedings in accordance with this Ruling and Order, and close this case.

The Clerk's Office is instructed that, if any party appeals to this court the decision made after the remand, any subsequent Social Security appeal is to be assigned to this judge.

**SO ORDERED** at Bridgeport, Connecticut, this 23rd day of March, 2020.

    /s/ Victor A. Bolden
Victor A. Bolden
United States District Judge